O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ANN BURRIDGE,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting Social Security Commissioner,<br><br>Defendant. | Case No. CV 15-3960-DFM<br><br>MEMORANDUM ORDER AND OPINION |

Plaintiff Ann Burridge ("Burridge") appeals from the final decision of the Administrative Law Judge ("ALJ") denying her application for disability insurance benefits. On appeal, the Court concludes that the ALJ erred by not calling on the services of a medical advisor to determine the onset date of Burridge's physical impairment. The ALJ also erred in determining Burridge's physical limitations at step three and in discrediting her testimony. Therefore, the Court reverses the ALJ's decision and remands this matter for further administrative proceedings.

///

///

///

# I.

# BACKGROUND

Burridge applied for disability insurance benefits on July 19, 2011, alleging disability that made her unable to work beginning on September 1, 2007. Administrative Record ("AR") 54-55, 64. Her date last insured for these benefits was March 31, 2008. Id.; see Joint Stipulation ("JS") at 2.[1]

The Commissioner denied Burridge's claims in July 2011 and again on reconsideration in September 2012. AR 31-35, 41-44. Burridge, represented by counsel at this point, requested a hearing. AR 30. Burridge missed the first hearing due to a mistake about the date. AR 27, 325-39. Burridge testified at a second hearing on January 16, 2014. AR 340-62.

The ALJ concluded that Burridge was not under a disability before March 31, 2008—the date she was last insured. AR 13. Applying the five-step sequential evaluation process, the ALJ found at step one that Burridge did not engage in substantial gainful activity during the relevant seven-month period. AR 15. At step two, the ALJ found that Burridge had a severe impairment of essential tremor. Id. At step three, the ALJ determined that Burridge did not have a listed impairment through the date last insured. AR 15-18. The ALJ also found that through the date last insured, Burridge had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, limited to unskilled work and occasional fine fingering. AR 19-22. After concluding that Burridge was unable to perform past relevant work, the ALJ found—based on the testimony of a vocational expert ("VE")—that jobs existed in the national economy that Burridge could have performed through the date last insured. AR 22-23. Specifically, the ALJ found that Plaintiff could work as a dishwasher and a furniture rental clerk. AR 23.

---

[1] Citations to the Joint Stipulation refer to the CM/ECF pagination.

## II.
## ISSUES PRESENTED

The parties present three issues: (1) whether, when considering the record as a whole, the ALJ's finding regarding Burridge's RFC is supported by substantial evidence; (2) whether the ALJ improperly evaluated Burridge's mental impairment at step two and issued an incomplete finding regarding Burridge's RFC, thus undermining the step five finding; and (3) whether the ALJ improperly discredited Burridge's testimony. JS at 3, 6-8.

## III.
## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla, but less than a preponderance. Id. To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

///
///
///

## IV.
## DISCUSSION

**A.  The ALJ Erred in Failing to Call on a Medical Advisor to Determine Burridge's Physical Impairment Onset Date**

As an initial matter, Burridge argues that this Court should remand because the ALJ had "no medical opinion evidence" to support her RFC findings, given that she rejected all treating-source opinions and credited opinions that did not support the findings. JS at 5-6. This argument misstates the law and the record. The fact that no single medical opinion recommended the ALJ's ultimate RFC finding is not fatal. The RFC must "be based on <u>all</u> of the relevant evidence in the case record" and contain "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Social Security Ruling ("SSR") 96–8p, 1996 WL 374184 (July 2, 1996) (emphasis in original). Here, as the ALJ observed, Burridge's medical records supported the finding that Burridge suffered from the severe impairment of an essential tremor before the date last insured. AR 20-22; see, e.g., AR 85, 90, 95, 104, 115, 117, 119, 155-156, 159, 160, 162, 166, 178 (all records before the date last insured discussing Burridge's tremor). In short, the ALJ did not make up the "occasional fingering" restriction out of thin air, as Burridge implies.

As part of this argument, however, Burridge asserts that the ALJ committed legal error by failing to retain a medical expert to determine the onset date of Burridge's severe essential tremor impairment, now diagnosed as Parkinson's disease. JS at 6-8. The Court agrees that the ALJ should have retained a medical expert.

///
///

### 1. Applicable Law

SSR 83-20 sets forth guidelines for determining the onset date of disabilities. See SSR 83-20, 1983 WL 31249. The onset date of disability is defined in the ruling as "the first day an individual is disabled as defined in the Act and the regulations." SSR 83-20. With respect to disabilities with difficult-to-discern onset dates, the SSR states:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process. . . . In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

SSR 83-20. "[I]n this context 'should' [call on the services of a medical advisor] means 'must.'" Armstrong v. Comm'r of Soc. Sec. Admin., 160 F.3d 587, 590 (9th Cir. 1998). Thus, "[i]n the event that the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83–20

requires the [ALJ] to call upon the services of a medical advisor and to obtain all evidence which is available to make the determination." DeLorme v. Sullivan, 924 F.2d 841, 848 (9th Cir. 1991).

### 2. The Record

There is substantial evidence in the record to suggest that Burridge's tremor was a disabling impairment before the date of the second ALJ hearing in 2014.

#### a. Medical Records

As the ALJ acknowledged in the hearing, doctors had observed Burridge's tremor as early as the 1990s. See AR 350; AR 119 (noting that she has "had 'shaky hands' for years" in 1995), 115, 117 (noting "upper extremity tremor" in 1995 and 1996). In 2001, medical records recorded her "total body tremors." AR 178. Notes from 2005 mention "whole body tremors." AR 166. Physician notes from 2006 and 2007 remark on Burridge's lip and hand tremors. AR 85, 95, 162. In November 2006, physician notes reflect that "she has had a tremor since she was age 17 years old. It runs in the family and has improved with alcohol." AR 90. Notes from February 2007 state that Burridge

> has been plagued by tremor since age 16. It runs in her family as both her father and mother had tremors starting . . . at relatively young ages. In any case, it has become increasingly problematic. It is predominantly an action tremor that can affect her head, voice, and extremities. Eating and writing is difficult, particularly when she is stressed. She finds accentuation of the tremor with . . . anxiety, fatigue, hunger. She has found wine helpful to subdue the tremor and actually has been drinking up to a bottle of wine in the evening. Usually afterwards, there is a rebound. She took Inderal at one point. It was short-acting, found that it subdued the tremor for about two hours and then would recur. She really has not been

> on other medications to treat the tremor over the years. . . . She feels she has had some motor difficulty characterized by 'lousy coordination and mild imbalance' over her lifetime . . . She does exercise with swimming and finds the tremor aggravated post-exertionally.

AR 104.

In October 2006, Burridge reported that her tremors had increased, and then in August 2007, she reported a decrease. AR 162, 159. Burridge reported that her tremors had "much [decreased]" on February 15, 2008, but a month later, she reported that "tremors [were] a [problem]" and that medicine had not been effective. AR 155, 156. (The ALJ does not mention the March 2008 worsening in her opinion. Instead, the ALJ mentions only the improvement in February. See AR 19.)

In February 2009, Burridge reported the tremor was "very bad." AR 277. A neurological consultation from 2010 stated, "[Burridge] now states that she is barely able to use utensils or write her name" and that the tremors improved with alcohol. AR 223. In the physical exam, the doctor noted "significant positional tremor with the arms outstretched, which has both a rotary component as well as up and down component. Her head has a side-to-side component. It definitely gets worse when she is walking or when she starts talking." Id. The physician described it as a "fairly severe essential tremor." AR 224.

A doctor who had treated Burridge beginning in January 2009 noted in a July 2012 opinion that Burridge was no longer able to write and had lost fine motor skills. AR 227. A treating doctor in December 2012 noted that Burridge's "tremor gets quite severe with any type of intention . . . [she] can barely write at this point and she states despite having [tried] to apply for multiple jobs, . . . she has not been hired typically because she starts shaking

and has tremors during interviews." AR 284.[2] He believed she might have Parkinson's disease. Id. A different doctor diagnosed Burridge with Parkinson's disease in 2013. AR 290.

          b.      Burridge's Testimony at the ALJ Hearing

At the ALJ hearing,[3] Burridge testified that the tremor first appeared when she was a child and that both of her parents had Parkinson's disease.[4] AR 349. She stated that she left her job as an administrative assistant in September 2007 when she "couldn't really type anymore" and "could barely hold a telephone." AR 347. Burridge explained that she left her job because of the tremor, after seeing a doctor who thought she should take disability time off because of the tremor and "emotional issues." Id. She also factored into her decision a "big shift in people working" at her place of employment and her supervisor's departure. AR 347-48.

Burridge explained that before she left her job permanently, she began working part-time at home because her tremor prevented her from working an eight-hour day. With more activity, the tremor would spread from her hands to her face and feet. AR 351, 353. She would work for 30 minutes, take a break for 10 minutes, and repeat that pattern, working on weekends to make up lost time. AR 353. The tremor made working problematic as early as 2006, but in 2007, her 'hands [shook] so much that [she could not] be accurate when . . .

---

[2] Intention tremors are "maximal during movement toward a target," such as when dialing numbers on a phone or pushing buttons. Merck Manual at 1772.

[3] As explained below, the ALJ's credibility determination was erroneous. Therefore this Court relies in part on Burridge's testimony.

[4] Altthough Parkinson's disease "rarely" begins in childhood or adolescence, "about 15 to 20% of patients have a family history." Merck Manual at 1765.

typing or using a mouse or talking on the phone or pressing a button of any kind." AR 352. Stress, anxiety, and physical activity made the tremor worse. AR 352-353. Despite sometimes working from home, she was required to be in the office for 5 or 6 hours a day, and her tremor became so bad by 2007 that she could not perform her job adequately for that amount of time. AR 353-354. In 2010, she began looking for part-time work, but could no longer perform her former work as an administrative assistant or seamstress. AR 354-355.

When asked about what activities were difficult in the months before she left her job in September 2007, Burridge testified that driving, carrying boxes, and using computer equipment had become difficult. AR 355. Since 1999, she has been unable to pick up a glass without spilling the contents and uses straws to drink. AR 356.

### 3. Analysis

The ALJ determined that Burridge was not disabled before the date last insured but assiduously avoided making any findings as to whether Burridge became disabled after that date. The language of SSR 83-20 suggests that the ALJ was not required to call an expert because she made no disability finding. See SSR 83-20 (defining the onset date of disability as "the first day an individual is disabled as defined in the Act and the regulations"). But the Ninth Circuit has indicated that the ALJ should call a medical expert to determine date of onset if there is substantial evidence that a claimant has become disabled since the date last insured and the onset date must be inferred. Sam v. Astrue, 550 F.3d 808, 810-11 (9th Cir. 2008). This is especially true with disorders or conditions, like Parkinson's disease that "manifest themselves over a period of time." Morgan v. Sullivan, 945 F.2d 1079, 1081 (9th Cir. 1991); see SSR 83-20 ("With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. . . . In such cases, it will be necessary to infer the onset date from the

medical and other evidence that describe the history and symptomatology of the disease process."); see also Robert S. Porter, M.D., et al., eds., The Merck Manual of Diagnosis and Therapy 1765 (Merck Research Labs., 19th ed. 2011) (hereinafter, "Merck Manual") ("Parkinson's is an idiopathic, slowly progressive, degenerative [Central Nervous System] disorder.").

As detailed above, there is substantial evidence in the record to suggest that Burridge was disabled with Parkinson's disease at the time she testified—and that she may have quit her job before the date last insured due to this disability. The ALJ's failure to develop the record by calling a medical expert to formally assess the onset date of Burridge's disability was legal error and requires remand.[5] See Lan Ying Xie v. Colvin, No. 14-2325, 2015 WL 5542817, at *14 (N.D. Cal. Sept. 18, 2015) ("The United States argues that SSR 83-20 does not apply because the ALJ did not make a determination that Plaintiff was disabled at any point. . . .This argument flies in the face of the well-established rule that the ALJ has a duty to develop the record . . . [The ALJ] may not evade her duty to develop the record as to the onset date simply by failing to formally address the question of whether Plaintiff was at any point disabled."); Lauser v. Colvin, No. 13-05990, 2014 WL 4246159, at *8 (N.D.

---

[5] Burridge argues that she has "corrected" the ALJ error by retaining the service of a neurologist, Dr. Stephen Genest, and requests remand on this basis for the ALJ to take this new opinion into account. JS at 8-10. This Court does not agree that this "new evidence" by itself would be a basis for remand. And it is worth noting that Dr. Genest's opinion was rendered six years past the date last insured, making it especially attenuated. However, the ALJ will presumably consider Dr. Genest's opinion on remand. See Smith v. Bowen, 849 F.2d 1222, 1225 (9th Cir.1988) ("[M]edical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the preexpiration condition."); Kish v. Colvin, 552 F. App'x 650, 651 (9th Cir. 2014) ("Evaluations conducted after the last insured date can still be relevant to assessing a claimant's condition during the appropriate period.").

Cal. Aug. 27, 2014) ("Here, the record supports a finding that Plaintiff had impairments that may have been disabling prior to her date last insured. . . . Although the ALJ may be correct that the disability onset did not occur until 2011, the record indicates physical impairments before the date last insured and it is difficult to determine, based on the record alone, when the physical impairments became disabling. Plaintiff's conditions did not arise overnight and their onset is ambiguous. Thus, because the onset date of Plaintiff's physical impairments is ambiguous, the ALJ was required to call a medical expert before inferring the date.").

B.  **The ALJ Erred in Assessing Burridge's RFC**

Burridge also argues that the ALJ erred in assessing her mental impairments at step two. JS at 20. Burridge claims that there was substantial evidence in the record to show that Burridge's depression and anxiety caused more than a minimal effect on her ability to work. Id. Burridge also argues that the limitation to "occasional fine fingering" did not capture all of the physical limitations supported by the record, and that the ALJ therefore also erred at step three in determining Burridge's RFC. Id. at 22.

The Court disagrees with Burridge's contention that substantial evidence demonstrate that her mental impairments more than minimally affected her ability to work before March 2008. But the Court agrees with Burridge on the issue of her physical limitations.[6]

1.  **Applicable Law**

At step two, the ALJ assesses whether the claimant has a medically severe mental or physical impairment or combination of impairments that significantly limits her ability to do basic work activities. 20 C.F.R. §§

---

[6] The Commissioner overlooked this issue in the Joint Stipulation. See JS 26-27.

11

404.1520(a)(4)(ii), (c), 404.1521. The "ability to do basic work activities" is defined as "the abilities and aptitudes necessary to do most jobs." Id. § 404.1521(b). An impairment is not severe if it "has no more than a minimal effect on the ability to do basic work activities." SSR No. 96-3p, 1996 WL 374181 (July 2, 2996). Upon finding that a claimant has a severe impairment, the ALJ proceeds to step three of the disability analysis to determine if the impairment meets or equals a specific listed impairment. 20 C.F.R. § 404.1520(a)(iii). If no listing is met, then the ALJ determines the claimant's RFC. Id. § 404.1520(e). An RFC is the ability to do physical and mental work activities on a sustained basis despite limitations from impairments. Id. §§ 404.1520(e), 1545.

At the fifth step of the sequential analysis, the burden shifts to the Commissioner to demonstrate that the claimant is not disabled and can engage in work that exists in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(v); Lockwood v. Comm'r. of Soc. Sec. Admin., 616 F.3d 1068, 1071 (9th Cir. 2010). The ALJ may meet his burden at step five by asking a vocational expert a hypothetical question based on medical assumptions supported by substantial evidence in the record and reflecting all the claimant's limitations, both physical and mental, supported by the record. See Valentine v. Comm'r. of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009). "If a vocational expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy." Matthews v. Shalala, 10 F.3d 678, 681 (9th Cir. 1993) (internal quotation marks and citation omitted).

**2. Analysis**

Burridge did not meet her threshold showing that her mental impairments of major depressive disorder, panic disorder, alcohol abuse, and

posttraumatic stress disorder had more than a minimal effect on her ability to perform basic work activities before the date last insured. AR 16; Bowen v. Yuckert, 482 U.S. 137, 145 (1987) (placing burden on claimant). While the medical records reflect that Burridge was diagnosed at various points before March 2008 with anxiety, depression, and other ailments resulting in part from childhood traumas, see, e.g., AR 99, 162, Burridge points to nothing in her medical records before that date to indicate that these conditions in fact affected her ability to perform basic work activities. Quite the opposite—as the ALJ noted, Burridge was working full-time in 2007 in a "human relations capacity" and also had some private clients, worked for colleges, and sang at temple and at private parties and weddings. AR 17, 100-01.

  Burridge's testimony at the hearing does not bolster her argument. Burridge testified that she left her job in September 2007 because of the tremor. AR 347. She added that a doctor mentioned she should "take some disability time off because of the tremor and because of other emotional issues," but stated later that the job ended because the "tremor got worse." AR 347, 353. When the ALJ asked Burridge how her depression and anxiety affected her on a day-to-day basis at the time that she left her job, Burridge replied, "I would question myself all the time and ask other people if I was doing the right thing . . . I think it's gotten a little better . . . My supervisor was a good friend of mine so I didn't have trouble interacting with her and she was the person I spent most of my time with . . ." AR 358-59. Thus even Burridge could come up with little to suggest that her mental impairments prevented her from working before the date last insured. See also JS at 20-22 (citing only diagnoses and prescriptions). The ALJ did not err at step two in declining to find that Burridge had any severe mental impairments. See Matthews v. Astrue, No. 10-05496, 2011 WL 2940450, at *4 (W.D. Wash. June 17, 2011) ("Plaintiff argues the ALJ erred in failing to also find his PTSD and depression to be severe . . .

1  But plaintiff has pointed to no actual evidence showing [that these
2  impairments] had any significant impact on his ability to perform work-related
3  activities.").
4        The ALJ did err at step three in determining Burridge's RFC, however.
5  The medical records and Burridge's testimony suggest more limitations than
6  "occasional fine fingering." As of February 2007, Burridge's tremors made
7  writing difficult, and anxiety, stress, fatigue, hunger, and physical activity
8  exacerbated her tremor. AR 104. At the hearing, Burridge reported that she
9  could not work an eight-hour day in the months leading up to her quitting her
10 job in 2007 because her tremor worsened with more physical activity, and she
11 needed to take 10 minute breaks every 30 minutes. AR 351, 353. She could not
12 type, use a mouse, talk on the phone, or press buttons. AR 352. Driving and
13 carrying boxes had become difficult. AR 355. For years before 2008, Burridge's
14 hands shook so much that she could not drink without using a straw—making
15 the VE's conclusion that Burridge could have worked as a dishwasher in 2007
16 and 2008 particularly unlikely. AR 356. None of these limitations were
17 reflected in the RFC, and none were posed to the VE at step five. The ALJ
18 therefore had no basis to determine that Burridge could perform jobs in the
19 national economy, warranting remand. See Matthews, 10 F.3d at 681.

**C.  The ALJ Improperly Discredited Burridge's Testimony.**

Burridge argues that the ALJ improperly discredited her testimony regarding her physical and mental ailments. JS at 29-34. As noted above, the ALJ did not need to discredit Burridge's testimony regarding her mental ailments because even Burridge's testimony did not support a finding that her mental impairments more than minimally affected her ability to work before March 2008. But with respect to her physical symptoms, this Court agrees with Burridge.

///

### 1. Applicable Law

To determine whether a claimant's testimony about subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis. <u>Vasquez v. Astrue</u>, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the alleged pain or other symptoms. <u>Lingenfelter</u>, 504 F.3d at 1036. "[O]nce the claimant produces objective medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 345 (9th Cir. 1991) (en banc). To the extent that an individual's claims of functional limitations and restrictions due to alleged pain are reasonably consistent with the objective medical evidence and other evidence, the claimant's allegations will be credited. SSR 96–7p, 1996 WL 374186 (July 2, 1996).

If the claimant meets the first step and there is no affirmative evidence of malingering, the ALJ must provide specific, clear, and convincing reasons for discrediting a claimant's complaints. <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 883 (9th Cir. 2006). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." <u>Reddick</u>, 157 F.3d at 722 (quoting <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996)). The ALJ must consider a claimant's work record, observations of medical providers and third parties with knowledge of claimant's limitations, aggravating factors, functional restrictions caused by symptoms, effects of medication, and the claimant's daily activities. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1284, n.8 (9th Cir. 1996). The ALJ may also consider an unexplained failure to seek treatment or follow a prescribed course of treatment and employ other ordinary techniques of credibility evaluation.

Id.

### 2. ALJ Opinion

The ALJ reasoned as follows in rejecting Burridge's testimony on her physical impairments:

> The undersigned notes that the claimant's tremors were "much improved" in February 2008 after decreasing her alcohol consumption to a bottle a week, swimming and going to the gym, and doing volunteer work . . . Moreover, the medical record establishes that are [sic] tremors were controlled with medication prior to the date last ensured . . . Ironically, [] treatment records in June 2009 reflect that claimant just wanted to sit and knit and watch television. Knitting would appear inconsistent with the alleged severity of her tremor. . . . The undersigned finds that claimant is not fully credible as the medical evidence does not fully support the claimant's allegations. . . [T]he medical evidence shows that the claimant's impairments due [sic] limit her to a certain degree. However, it also appears from the medical evidence, date prior to the date last insured, that the claimant is not fully disabled. In fact, the claimant reported that she has been looking for work, knitting and perform [sic] her daily activities of daily living. Moreover, the undersigned finds that the medical evidence before the date last insured of March 31, 2008, is only adequate to support a finding that the claimant is limited to only occasional fine fingering.

AR 19-20, 22.

### 3. Analysis

As the ALJ acknowledged at the first step, objective medical evidence supported Burridge's claim of an underlying impairment that could reasonably

be expected to produce her alleged physical symptoms.[7] See AR 20; Vasquez, 572 F.3d at 591.

At the second step, the ALJ did not provide clear and convincing reasons for discrediting Burridge's complaints. The fact that Burridge was actively looking for work does not mean that she would have been able to perform that work. Furthermore, she was looking for part-time work (AR 355) and the standard for disability is the ability to sustain full-time work. See SSR 96-8p, 1196 WL 374184 (July 2, 1996).

The contention that Burridge performed her "daily activities of daily living"—the ALJ does not elaborate on what these activities were—is not inconsistent with her other testimony. See Garrison v. Colvin, 759 F.3d 995, 1016 (9th Cir. 2014) ("ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about [symptoms], because impairments that would unquestionable preclude work . . . will often be consistent with doing more than resting in bed all day."); Fair v. Bowen, 885 F.3d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferrable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest . . . ."). As for Burridge's alcohol consumption, the medical evidence reflects that Burridge used alcohol to treat and improve her tremor. See AR 90, 104, 223.

Burridge's symptoms may have improved in February 2008, but by March, they had worsened. AR 155-156. Burridge's tremors had worsened and improved before within months, and the improvement in February 2008 was not a reason to doubt that the tremors had been severe enough to make her

---

[7] At step two, the ALJ's claimed that "the medical evidence before the date last insured of March 31, 2008, is only adequate to support a finding that the claimant is limited to only occasional fingering." AR 21-22. As explained above, the Court disagrees with that assessment.

quit her job in September 2007, or that the tremors had worsened by March 2008.

The fact that Burridge swam and went to the gym is not a clear and convincing indication that Burridge's claims were not credible. Medical records from February 2007 indicate that swimming made her tremor worse, but she persisted in the inarguably healthy activity despite that downside. See AR 104. The ALJ claims that Burridge's tremors were controlled with medication before the date last insured but cites no page number in the record to support this claim, and other records demonstrate that medication had <u>not</u> helped Burridge's tremors. See AR 104, 155.

This leaves only Burridge's statement to a physician in June 2009 that she "just wanted to sit and knit and watch television." The records at issue state, "Don't care just want to sit and knit and watch [blank.]" AR 268. The ALJ focused on this excerpt to the exclusion of other evidence: The same notes state, "Still feel very off-balance – if I shut my eyes I fall over. Was bumping into things." Id. Other records from the same time period state that her "shaking" was "worse." AR 266. The ALJ also did not consider whether Burridge's statement was aspirational (i.e., "I wish I could sit and knit"). Regardless, this Court disagrees with the ALJ's assessment that knitting is inconsistent with the alleged severity of Burridge's tremor. Burridge testified that her tremor worsened with physical activity and medical records predating her date-last-insured confirm this. See AR 104, 351-53. Moreover, nothing in the record indicates how long Burridge was able to knit at any one time. Knitting for a short period of time at rest differs greatly from being able to work an eight-hour day.

The "knitting" remark from a June 2009 medical record is not a clear and convincing reason that supports an adverse credibility finding. See White v. Colvin, No. 14-5584, 2015 WL 4734915, at *9 (N.D. Cal. Aug. 10, 2015)

("The ALJ next noted that White's credibility was undercut by his admission that he played pool for roughly half-an-hour on a daily basis. . . . [A]n ability to play billiards for (at most) half an hour a day is not plainly inconsistent with White's claimed impairments and pain. Nor would the ability to play pool for thirty minutes be easily transferable to a work environment.").

## IV.
## CONCLUSION

For the reasons stated above, the decision of the Social Security Commissioner is REVERSED and the action is REMANDED for further proceedings consistent with this opinion.

Dated: June 17, 2016

_____
DOUGLAS F. McCORMICK
United States Magistrate Judge